THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VASILE IOAN BARSAN,<br><br>Plaintiff,<br><br>v.<br><br>KNIGHT TRANSPORTATION INC.,<br><br>Defendant. | CASE NO. C10-0047-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 60). Having thoroughly considered the parties' briefing and the relevant record, the Court hereby GRANTS the motion for the reasons explained herein.

## I.   BACKGROUND

In March 2008, Shawn Sears of Defendant Knight Transportation, Inc. hired Plaintiff Vasile Ioan Barsan as a truck driver. (Dkt. No. 63 at 2.) Mr. Barsan informed Mr. Sears during the interview process that he was Romanian, and that he sometimes took long vacations back to Romania to see his friends and family. (Dkt. No. 63 at 2.) Mr. Sears acted as Mr. Barsan's supervisor throughout his employment. (Dkt. No. 63 at 1.)

Mr. Barsan was hired as a "casual driver." (Dkt. No. 63 at 2.) Pursuant to Knight Transportation company policy, casual drivers are entitled to take time off at their discretion, as long as they let other drivers use their truck. (Dkt. No. 63 at 2, 14.) During the first part of his

employment, Mr. Barsan was frequently assigned to the long-haul route between Seattle and Los Angeles. (Dkt. No. 63 at 3; Dkt. No. 62 at 2.) Mr. Barsan had requested this route because he wanted to spend time in Los Angeles to pursue his acting career. (Dkt. No. 63 at 3.) Mr. Barsan's job performance during this early period was by all accounts satisfactory, and he was recognized as a "top performer" in a newsletter to all of the drivers. (Dkt. No. 63 at 2.) His supervisor, Mr. Sears, also allocated him certain privileges that others in his position did not receive, such as the use of a new truck and a pay increase. (Dkt. No. 63 at 2.)

The relationship between Mr. Barsan and Knight Transportation functioned well while Mr. Barsan was able to drive frequent routes to Los Angeles. However, tensions arose when the demand for Seattle to Los Angeles trips began to slow, and Knight Transportation began assigning Mr. Barsan to run routes between Seattle and Canada more frequently. (Dkt. No. 63 at 2.) Mr. Barsan was upset about this as he wanted to drive the Los Angeles route full-time. (Dkt. No. 63 at 4; Dkt. No. 62 at 2.) During this time, Mr. Barsan also encountered resistance to his practice of using his truck as his residence while he was in Los Angeles. (Dkt. No. 63 at 3; Dkt. No. 62 at 2.) Pursuant to Knight Transportation company policy, drivers are required to allow others to use their truck when they are not working. (Dkt. No. 63 at 3, 14.) Mr. Barsan routinely refused to let others access his truck during his time off. (Dkt. No. 62 at 2.)

As a result of Mr. Barsan's discontent about these issues, he routinely refused to comply with managerial instructions and became increasingly disruptive and difficult to work with. (Dkt. No. 62 at 2; Dkt. No. 63 at 3-4.) Mr. Sears repeatedly discussed these issues with Mr. Barsan and eventually began to document Mr. Barsan's continuing pattern of insubordinate conduct. (Dkt. No. 63 at 3-4.) On May 26, 2009, the conflict escalated. Mr. Barsan was assigned to drive a load to Canada, but he refused. (Dkt. No. 63 at 4; Dkt. No. 62 at 3.) Initially, he told the operations manager that he couldn't drive the load to Canada because he needed to take a trip to Romania. (Dkt. No. 62 at 3.) Subsequently, after Mr. Barsan came into the office to discuss the matter with management and could provide no proof that he was going to Romania, he stated that he

wouldn't drive the load to Canada because he only wanted to drive the Los Angeles route, and that Knight Transportation was interfering with his goal to become an actor. (Dkt. No. 63 at 4.) During the course of this conversation, Mr. Barsan became increasingly agitated, pacing up and down the room, and ultimately launched into an aggressive personal attack on Mr. Sears that went on for at least an hour. (Dkt. No. 63 at 4; Dkt. No. 62 at 3.) Mr. Barsan was informed that he could either stop acting inappropriately or he would be fired. (Dkt. No. 62 at 3.) Mr. Barsan refused to stop. (Dkt. No. 62 at 3.) Eventually, Mr. Sears fired Mr. Barsan. (Dkt. No. 62 at 3.)

Following his termination, Mr. Barsan appealed for relief from the U.S. Equal Employment Opportunity Commission, which concluded that the evidence did not support a national-origin discrimination or retaliation claim. (Dkt. No. 7 at 7.) Shortly thereafter, Mr. Barsan filed a complaint in federal district court against Mr. Sears. (Dkt. No. 7.) He later amended his complaint, substituting defendant Knight Transportation in place of defendant Mr. Sears. (Dkt. No. 36.) Defendant Knight Transportation now moves for summary judgment.

## II. DISCUSSION

### A. Applicable Law

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bear[s] the initial burden of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, it is entitled to summary judgment if the nonmoving party fails to designate "by affidavits, depositions, answers to interrogatories, or admissions on file, specific facts showing that there is a genuine issue for trial." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will not be sufficient." *Id.* at 252. Rather, the nonmoving party must present "significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment." *Arpin*, 261 F.3d at 919. "Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Id*.

### B.     Plaintiff's Claims

The Court construes Plaintiff's complaint to allege a claim for retaliation and for national-original discrimination under the Civil Rights Act of 1964 ("Title VII").  Defendant argues that Plaintiff has failed to offer evidence sufficient to show that there is a genuine issue for trial and that therefore an entry of summary judgment in favor of Defendant is appropriate. The Court agrees.

"The elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) [he or] she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008). In order to sustain a prima facie case of national-origin discrimination, a plaintiff must show that (1) he or she is a member of a protected class, (2) he or she was qualified for the position, (3) he or she experienced an adverse employment action, and (4) similarly situated individuals were treated more favorably, or other circumstances existed that give rise to an inference of discrimination. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

With respect to Plaintiff's national-origin discrimination claim, the Court finds that Plaintiff has not presented evidence sufficient to establish a prima facie case.  In particular, he has failed to satisfy the last prong of the standard by showing "by affidavits, depositions,

answers to interrogatories, or admissions on file, specific facts showing that there is a genuine issue for trial" with respect to whether other similarly situated individuals were treated more favorably or other circumstances existed that give rise to an inference of discrimination. *See Arpin*, 261 F.3d at 919. In fact, Plaintiff's own submissions indicate his belief that Knight Transportation treated *all* of its drivers unfairly, regardless of their national origin. (*See, e.g.* Dkt. No. 12 at 2; Dkt. No. 10 at 5; Dkt. No. 4 at 2). Furthermore, the record indicates that Plaintiff was treated more favorably in certain respects, as he received certain benefits not enjoyed by other non-Romanian drivers, such as the assignment of a new truck and a pay raise. (Dkt. No. 63 at 2.) Finally, Plaintiff's behavior – including his documented history of insubordination – distinguishes him from other non-Romanian comparators as Plaintiff has not presented any evidence demonstrating that other employees exhibited the same behavior without being terminated.

Plaintiff has similarly failed to present evidence supporting a prima facie case of retaliation. In particular, Plaintiff has not shown that his termination was causally related to a protected activity in which Plaintiff was engaged. On the contrary, Plaintiff's submissions indicate his belief that Knight, and in particular his supervisor at Knight, refused to let him drive only his preferred route and terminated his employment because of his acting aspirations. Plaintiff states, for example, as follows:

> When the defendant Shawn Sears he found out that I have a plan to become an Actor in movies, it is very logical that he became gelous [sic], or very gelous [sic] against me. And this is also another reason for Shawn and for people in Phoenix, AZ. for anybody of the employees of Knight Transportation from their management. They could be afraid of me that if I could become somebody in the future as an Actor then they could think that Knight Transportation could be watched and followed by FBI . . . of course they are worried to keep that kind of Driver at their Company the one who said that he is planing [sic] to become an Actor and to become part of [the] Chuck Norris team!

(Dkt. No. 16 at 3.)

Similarly, in his original Complaint, Plaintiff states that:

> I told my former manager Shawn Sears that I was planning to change my career in the future to become an Actor, and since I told him this he was causing me many problems and he just wanted to terminate me.

(Dkt. No. 7 at 4.)

Plaintiff's response to Defendant's motion for summary judgment again references his belief that Mr. Sears kept him from driving his preferred route because of jealousy about Plaintiff's acting aspirations. (*See* Dkt. No. 65 at 2.) Needless to say, Plaintiff's engagement with the acting profession does not constitute a protected activity under Title VII. Moreover, Plaintiff provides no evidence that supports the notion that his termination occurred because he was Romanian or even because he wanted to take a trip to Romania.[1] Rather, the evidence suggests that he was terminated because of a documented pattern of insubordination and disruptive behavior, which culminated in a public and personal attack on his supervisor. (*See* Dkt. No. 63 at 4-5, 23; Dkt. No. 62 at 3.)

In sum, the Court concludes that Plaintiff failed "to offer evidence from which a reasonable jury could return a verdict in [his] favor" on either his national-origin discrimination or retaliation claims. *Arpin*, 261 F.3d at 919. Accordingly, Defendant is entitled to summary judgment.

---

[1] Indeed, the fact that Mr. Sears was aware of Plaintiff's Romanian nationality at the time he hired him (*see* Dkt. No. 63 at 2) makes it less plausible that he would have been mistreated or fired by Mr. Sears on the basis of his national origin.

ORDER
PAGE - 6

**III.    CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment (Dkt. No. 60). Defendant's motion to strike Plaintiff's surreply (Dkt. No. 68) is DENIED as moot.

DATED this 22nd day of December 2011.

_/s/ John C. Coughenour_
John C. Coughenour
UNITED STATES DISTRICT JUDGE
